M52HNexO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  NEXSTAR MEDIA INC.,

4              Plaintiff,

5        v.                      21 Civ. 6860 (JGK)

6  COMCAST CABLE COMMUNICATIONS,
   LLC,
7
             Defendant.
8                                Telephone Conference
   ------------------------------x
9                                New York, N.Y.
                                 May 2, 2022
10                               11:05 a.m.

11 Before:

12              HON. JOHN G. KOELTL,

13                               District Judge

14                  APPEARANCES

15 COVINGTON & BURLING LLP (Los Angeles)
        Attorneys for Plaintiff
16 BY:  MITCHELL A. KAMIN

17 DAVIS POLK & WARDWELL
        Attorneys for Defendant
18 BY:  DANA MEREDITH SESHENS

19

20

21

22

23

24

25

M52HNexO

1              (The Court and all parties present remotely)

2              THE LAW CLERK:  The case is Nexstar Media

3    Inc. v. Comcast Cable Communications LLC, case

4    No. 21 Civ. 6860.

5              THE COURT:  All right.  Who's on the line for the

6    plaintiff?

7              MR. KAMIN:  Good morning, your Honor.  This is Mitch

8    Kamin from Covington and Burling, for Nexstar Media.

9              THE COURT:  And who's on the line for the defendant

10   Comcast?

11             MS. SESHENS:  Good morning, your Honor.  This is Dana

12   Seshens, Davis Polk & Wardwell LLP, for the defendant Comcast

13   Cable Communications LLC.

14             THE COURT:  All right.  This is a motion to dismiss or

15   stay by the defendant.  I'm familiar with the papers.

16   Perfectly prepared to listen to anything that the parties would

17   like to tell me.

18             Ms. Seshens.

19             MS. SESHENS:  Yes.  Thank you, your Honor.  May it

20   please the Court, Dana Seshens, for the defendant, Comcast

21   Cable Communications.

22             This case, in our view, your Honor, is exactly the

23   type of case to which we think the primary jurisdiction

24   doctrine should apply, and in fact, the case for application of

25   that doctrine has only become stronger since briefing on

1    Comcast's motion was complete.

2            As your Honor undoubtedly has seen in the record since

3    the time that briefing was completed, the FCC has notified

4    Comcast in writing that its petition, which was

5    administratively converted to an informal complaint, is under

6    review by the Media Bureau right now.  Also since that time,

7    another cable operator, Spectrum, owned by Charter has filed

8    with the FCC a second informal complaint against Nexstar that

9    is substantively identical to Comcast's complaint, raising

10   similar issues based upon the same underlying conduct.  And we

11   would submit, your Honor, that the technical and policy issues

12   presented in this case satisfy all of -- I'm sorry, your Honor.

13            THE COURT:  Can I stop you just there.

14            MS. SESHENS:  Of course.

15            THE COURT:  The complaint by Comcast with the FCC is a

16   violation of the ownership regulations, right?

17            MS. SESHENS:  Among other things, but, yes, that is

18   one of the contentions in the complaint.

19            THE COURT:  But there's no allegation in the complaint

20   of a violation of the negotiation regulations?

21            MS. SESHENS:  That is correct, your Honor.  There's no

22   specific reference to the negotiation regulation.  I think part

23   and parcel of the allegations in the FCC complaint is that

24   Nexstar's conduct has violated, at least in Comcast's view, any

25   number of FCC rules and orders, the *Nexstar/Tribune* order being

1    one that's identified, but the FCC would have the discretion to

2    go beyond the rules that are identified.

3         But to directly answer your question, the specific

4    negotiation rule or regulation is not identified in the Comcast

5    FCC complaint.

6         THE COURT:  So why should I wait for the FCC to decide

7    the current complaint that doesn't directly raise the issue of

8    a violation of the negotiation regulations?  Doesn't the

9    contract issue that's before me raise simply the question of

10   whether the negotiation violates any FCC negotiation

11   regulation?

12        MS. SESHENS:  Well, respectfully, your Honor, I think

13   the contract issue --

14        THE COURT:  Hold on.  Hold on one second.

15        MS. SESHENS:  I'm sorry.

16        THE COURT:  Please try to scrub "respectfully" from

17   your vocabulary when you talk to me.  I assume that unless

18   lawyers give me reason to doubt it that what they say to me is

19   respectfully and with all due respect.  And oftentimes

20   "respectfully" is simply an effort by lawyers to tell the Court

21   that even though what may follow may otherwise be subject to

22   contempt, don't take it that way, Judge, because I said "with

23   all due respect."

24        MS. SESHENS:  I appreciate that admonition, your

25   Honor, and I'd like to think my next remarks would not be

1  subject to contempt, but, rather, would reflect reasonable

2  disagreement perhaps with the proposition that the Court has

3  offered.

4          And what I would say, your Honor, is that the contract

5  issue before the Court is actually broader than whether there

6  is any violation of the negotiation rule as Nexstar has

7  identified it, and the express language of the contract

8  requires a determination of whether Nexstar has the right to

9  negotiate retransmission consent for WPIX under the "FCC's

10  rules."  And the rules referenced are plural, and rules is

11  defined in the contract broadly to include the rules and

12  regulations and orders essentially of the FCC.  So there is no

13  limitation in the contract to a particular rule or regulation,

14  and certainly none to the negotiation rule itself.

15          So from our perspective, your Honor, the reason to

16  wait for the FCC is because the questions posed by Comcast in

17  the FCC complaint are exactly the questions this Court will

18  have to answer in determining whether Nexstar's conduct gives

19  it the ability to negotiate retransmission consent for WPIX

20  under the FCC rules as broadly defined.

21          THE COURT:  Well, that's your interpretation of the

22  contract.  There's a specific provision in the contract which

23  defines stations and provides an inclusion for new stations if

24  Nexstar is not prohibited from negotiating for retransmission

25  consent on behalf of such stations under FCC rules.

1           Now, I don't decide anything, of course, until it's

2     fully briefed, and the meaning of that contractual provision

3     will plainly be the subject of dispute between the parties, but

4     if that contract provision is eventually found to mean that --

5     require a determination whether Nexstar is prohibited from

6     negotiating for retransmission consent on behalf of such

7     stations under FCC rules, one would wonder whether the correct

8     interpretation of that contractual phrase is FCC negotiation

9     rules as opposed to rules -- any FCC rules, and one would

10    question whether the ownership rules would be a fair reading of

11    that provision.

12          I understand the argument about the broad scope of FCC

13    rules, but one would have to ask whether the ownership rules

14    are, for example, a prohibition on negotiating for

15    retransmission consent, if you follow what I'm asking.

16          MS. SESHENS:  Yes, your Honor.

17          THE COURT:  So that would come down to a question of

18    contract interpretation rather than an ultimate question of the

19    meaning of the ownership rules.

20          MS. SESHENS:  I think, your Honor, two points in

21    response.  I think, as a matter of contract interpretation,

22    FCC's rules is actually a defined term in the contract in

23    Section 1.  And the definition to which the parties agreed says

24    that FCC's rules means the rules, regulation, and promulgated

25    policies of the FCC.  So that could mean any number of rules,

1    regulations, and promulgated policies of the FCC.  If the

2    parties had intended to limit the ability to negotiate

3    retransmission consent to the so-called negotiation rule, we

4    would submit that the parties would have so agreed and/or would

5    have defined FCC's rules in the plural differently.

6            I think, relatedly, your Honor, you will be asked, in

7    deciding the interpretation of this provision, to conclude

8    whether Nexstar has the ability to negotiation for this

9    retransmission consent.  We would submit that the sheer fact

10   that the parties have differing views on which FCC rules are

11   applicable here is an illustration of why this case is

12   appropriate for a stay or dismissal without prejudice while the

13   FCC considers that issue.

14           THE COURT:  But the FCC is not considering that issue.

15   The FCC is not considering the contractual interpretation.

16           MS. SESHENS:  That is correct, your Honor.  The

17   question of the meaning of the retransmission consent agreement

18   is not directly before the FCC, but what the FCC has been asked

19   to weigh in on is whether Nexstar's conduct violates both the

20   national ownership cap, runs contrary to the *Nexstar/Tribune*

21   order, and otherwise undermines or undercuts the policies, the

22   promulgated policies, of the FCC.

23           So the FCC complaint, therefore, asks the FCC to weigh

24   in on that question in the first instance and then requests

25   that the FCC fashion a remedy to address that conduct in the

1    event it finds some form of a violation.  And in that event the

2    FCC, in the exercise of its discretion, which is virtually

3    exclusive in this regard, could fashion a remedy that prohibits

4    or restricts Nexstar's ability to negotiate retransmission

5    consent.  And that is expressly identified and set forth in the

6    FCC complaint that is currently pending.

7            THE COURT:  But that's highly speculative as to what

8    the FCC would do.  And the complaint in this action, and

9    correct me if I'm wrong, seeks damages for breach of contract

10   for fees that should have been paid and have not been paid.  Is

11   that fair?

12           MS. SESHENS:  Yes, I think that's a fair assignment,

13   your Honor.

14           THE COURT:  So it would be highly speculative to say

15   that in response to a complaint that doesn't specifically refer

16   to the negotiation of retransmission fees for WPIX, the FCC

17   would reach out to decide that question and, on top of that,

18   would not decide the question on a going forward basis, but

19   would say you're not entitled to all of these past fees.  On a

20   going forward basis, Nexstar argues there are lots of other

21   remedies to an alleged violation of the ownership rules,

22   including shedding stations in other markets.

23           Your turn.

24           MS. SESHENS:  Yes, your Honor.  That is Nexstar's

25   argument.  But I think, your Honor, from our perspective, the

1    downside to deferral here or referral or staying the case is

2    simply some delay without any prejudice to Nexstar.  The case

3    is about money damages, and the money will be available once

4    the FCC resolves this issue, to the extent that is how the

5    Court were to resolve the case.  But on the flip side, if the

6    Court were to proceed and make findings or determinations about

7    the meaning of this contract provision and, for example, were

8    to find that Nexstar has the authority to negotiate

9    retransmission consent, but the FCC, in the exercise of its

10   expertise and discretion, were to decide that Nexstar's conduct

11   gave rise to the need for remedial action that would prohibit

12   Nexstar from negotiating retransmission consent, then we have a

13   real conflict between the FCC's rule and this Court's ruling,

14   which could be avoided by simply staying this case or

15   dismissing it without prejudice while the FCC proceeds.

16           We would again submit that Nexstar is not prejudiced

17   by that, and it is free to return to this court or resume this

18   case, and we would proceed accordingly once the FCC has made

19   its determination.

20           THE COURT:  Why does the FCC have expertise in

21   determining the intent of the parties in entering into this

22   particular provision of the retransmission agreement?

23           MS. SESHENS:  So I don't think that's the expertise

24   that the FCC brings to bear.  And in fact, the interpretation

25   of the contract provision is not, as we've noted, squarely

M52HNexO

1   before the FCC.  That is obviously a question that the Court is

2   well positioned to address.  The FCC, however, does have the

3   expertise and the almost unfettered discretion to decide issues

4   around broadcast licensing.  And the Nexstar conduct that is

5   alleged in the FCC's petition directly bears on the propriety

6   of the WPIX license and who is negotiating appropriately

7   retransmission consent for that station.  And that issue of who

8   is properly -- or who is able to negotiate retransmission

9   consent is squarely at play, both before the FCC and before the

10  Court, based on the plain language of the agreement.

11          THE COURT:  Anything else before I turn to Nexstar?

12          MS. SESHENS:  I think -- your Honor, I think that

13  covers the gist of what our position is, which I know your

14  Honor is familiar with from the papers.  I think, again, just

15  to put a finer point on it, the nature of the parties'

16  arguments here and the disputes that have arisen in this motion

17  we really think highlight the reason why the primary

18  jurisdiction doctrine should apply here.  Given the nature of

19  the retransmission consent and licensing issues that

20  undoubtedly will come into play in this litigation, we think

21  the doctrine applies and that the prudent course would be to

22  stay or dismiss without prejudice this case while the FCC

23  resolves the issues concerning Nexstar's conduct and any

24  related remedies concerning the ability to negotiate

25  retransmission consent.

1    THE COURT:  OK.  Thank you.

2    Let me listen to Nexstar.

3    MR. KAMIN:  Thank you, your Honor.  It's Mitch Kamin

4    from Covington & Burling, for Nexstar.

5    It's clear you've absorbed the authority and the

6    arguments in our papers, so I won't belabor any of the points.

7    I'll simply say that, we, obviously, concur that this breach of

8    contract issue is squarely before the Court but not before the

9    FCC, and that any suggestion that issues germane to the breach

10   of contract action would be resolved in the FCC proceeding are

11   indeed highly speculative and depend on Comcast's argument that

12   the FCC might take up the petition, it might find Nexstar

13   violated the ownership cap, and it might impose a remedy that

14   affects Nexstar's ability to negotiate for WPIX, and we

15   disagree that any of that is likely to happen.  And just as one

16   example, the FCC has no obligation at all to act in response to

17   this informal complaint that Comcast filed last July.

18   So unless your Honor has questions for me, I would

19   submit on the papers.

20   THE COURT:  The defendant says the FCC has agreed to

21   take up the petition.

22   MR. KAMIN:  I don't think there's any indication that

23   the FCC has agreed to take up the petition, your Honor.  The

24   sequence is that the petition was filed last July seeking a

25   declaratory judgment.  If the FCC intended to commence

1 proceedings on the declaratory judgment, it would open the

2 public docket for public comment, and it has not done that.

3 Instead, in response to a Comcast inquiry concerning whether

4 the *ex parte* rules would apply to that proceeding in March last

5 month, the FCC sent a letter to Comcast saying that it would

6 consider its petition as an informal complaint.

7      "Informal complaint" is a very broad category.  That

8 includes everything from a consumer who's unhappy with

9 programming on their local television station to an issue such

10 as this.  And there's no indication in the record that the FCC

11 intends to act on that informal complaint, nor does it have an

12 obligation to act on that informal complaint, your Honor.

13      THE COURT:  OK.  Thank you.

14      Anything else?

15      MR. KAMIN:  Nothing from me, your Honor.

16      THE COURT:  OK.  I thank the parties.  I appreciate

17 the briefs.  I appreciate the arguments.  I'm prepared to

18 decide.

19      The plaintiff, Nexstar Media Inc., brought this action

20 against Comcast Cable Communications LLC for breach of

21 contract.  The claim arises out of Nexstar's allegations that

22 Comcast did not pay Nexstar certain fees owed by Comcast to

23 Nexstar under an agreement between the parties in connection

24 with television station WPIX.

25      Shortly prior to Nexstar's initiating this lawsuit,

1    Comcast had filed a petition with the Federal Communications

2    Commission (FCC).  The petition asks the FCC to find that

3    Nexstar owned WPIX, in violation of certain FCC rules limiting

4    ownership of commercial broadcast stations by a single entity,

5    the ownership cap.  Comcast now moves to stay or dismiss this

6    action pending the resolution of the FCC petition on the

7    grounds of the primary jurisdiction doctrine or pursuant to the

8    Court's inherent authority to stay a case.

9         The following facts are taken from the complaint as

10   well as other sources that the Court may consider on a motion

11   to stay or dismiss on the grounds of the primary jurisdiction

12   doctrine or pursuant to the Court's inherent authority.  *See*

13   *Canale v. Colgate-Palmolive Co.*, 258 F.Supp.3d 312, 324, note

14   11 (S.D.N.Y. 2017).  In particular, the Court takes judicial

15   notice of the existence of Comcast's FCC petition and of the

16   FCC's decision in *In re Application of Tribune Media Co.*,

17   19-30, 2019 WL 4440126 (FCC Sept. 13, 2019*); see*

18   *Miller v. DirecTV LLC*, No. 14 Civ. 7579, 2015 WL 12656912, at

19   note 1 (C.D. Cal. Jan. 8, 2015); *Lyons v. Coxcom, Inc.*,

20   718 F.Supp.2d 1232, 1237 (S.D. Cal. 2009), and of the

21   information contained therein to the extent undisputed.

22        Comcast is a multichannel video programming

23   distributor (MVPD).  Nexstar is a television broadcast station

24   group.  Nexstar is party to a retransmission consent agreement

25   with Comcast, the retransmission agreement.

1          Pursuant to that agreement, Comcast is authorized, in

2     exchange for a fee, to offer to Comcast clients Nexstar's

3     programming.  The retransmission agreement provides that

4     certain stations not initially covered by the agreement may

5     become covered by the agreement if Nexstar enters into a

6     contract to provide certain services to the station and if

7     Nexstar "is not prohibited from negotiating for retransmission

8     consent on behalf of such stations under FCC rules."  The same

9     terms and conditions will apply to such additional stations as

10    stations additionally covered by the agreement.

11         In 2019, Nexstar sought to acquire the broadcast

12    stations of Tribune Media Company.  Transfer of broadcast

13    station licenses requires FCC approval.  Because acquiring

14    Tribune's stations would have caused Nexstar to exceed the

15    ownership cap, in order to obtain FCC approval, Nexstar agreed

16    to divest certain stations, including WPIX, to bring Nexstar

17    below the ownership cap.  Nexstar represented to the FCC that

18    Nexstar would not be providing ongoing services under sharing

19    agreements to WPIX.  The FCC approved these transactions, and

20    the sales were consummated.

21         Mission Broadcasting, Inc., later sought to acquire

22    WPIX.  In seeking approval for this transaction, Mission

23    provided to the FCC a draft of an agreement into which Mission

24    intended to enter with Nexstar regarding WPIX.  The agreement

25    would give Nexstar the right to program WPIX, to sell the

1    station's advertising time, and to receive the station's

2    revenues.  The FCC approved Mission's purchase of WPIX.  And in

3    December 2020, Mission acquired WPIX, and Mission and Nexstar

4    executed the agreement.

5           In July 2021, Comcast filed a petition with the FCC.

6    The petition asked the FCC to find that Nexstar's relationship

7    with WPIX constituted ownership for the purposes of the

8    ownership cap, causing Nexstar to be in violation of the

9    ownership cap.  Two weeks later Nexstar initiated this action.

10          Nexstar contends that since December 2020, WPIX has

11   been governed by the retransmission agreement, and that Comcast

12   therefore owes licensing fees to Nexstar that it has not paid.

13   The FCC has not yet rendered a decision on Comcast's petition

14   that Nexstar's relationship with WPIX constituted ownership for

15   purposes of the ownership cap.

16          This Court has jurisdiction pursuant to 28 U.S.C.

17   Section 1332(a) because Nexstar is a Delaware corporation with

18   its principal place of business in Texas.  Comcast is an LLC

19   whose only member is a Pennsylvania corporation with its

20   principal place of business also in Pennsylvania.  *See*

21   *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC,* 692 F.3d 42,

22   49 (2d Cir. 2012).  The amount in controversy exceeds $75,000.

23          Federal courts have a virtually unflagging obligation

24   to exercise the jurisdiction given them.  *Colorado River Water*

25   *Conservation District v. United States*, 424 U.S. 800, 817

M52HNexO

(1976).  One exception to that obligation, however, is the

primary jurisdiction doctrine.  *Tassy v. Brunswick Hospital*

*Center, Inc.*, 296 F.3d 65, 68, note 2 (2d Cir. 2002).  The

doctrine allows a federal court to refer a matter extending

beyond the conventional experience of judges or falling within

the realm of administrative discretion to an administrative

agency with more specialized experience, expertise, and

insight.  *National Communications Ass'n, Inc. v. American*

*Telephone & Tel. Co.,* 46 F.3d 220, 222–23 (2d Cir. 1995).  This

narrow doctrine should not be applied where the issue at stake

is legal in nature and lies within the traditional realm of

judicial competence.  *Goya Foods, Inc. v. Tropicana Products,*

*Inc.*, 846 F.2d 848, 851 (2d Cir. 1988).

          In determining whether to apply the doctrine, the

threshold question is whether both the court and the agency

have jurisdiction over the same issue.  *Golden Hill Paugussett*

*Tribe of Indian V. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994).  If

this threshold is met, courts consider four factors:  (1)

whether the question at issue is within the conventional

experience of judges or whether it involves technical or policy

considerations within the agency's particular field of spirit

advertise; (2) whether the question at issue is particularly

within the agency's discretion; (3) whether there exists a

substantial danger of inconsistent rulings; and (4) whether a

prior application to the agency has been made.  *Ellis v.*

*Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006).

Even if these factors counsel in favor of applying the primary jurisdiction doctrine, courts sometimes refuse to apply the doctrine where it would cause undue judicial delay, although the continuing validity of this practice has been called into question. *See Id.* at 90.

Nexstar's claim in this case is that Comcast breached the retransmission agreement by failing to pay fees to Nexstar for Comcast's retransmission of WPIX. Comcast's defense is that Nexstar is not entitled to any such fees because the language of the retransmission agreement does not create any obligations by Comcast with respect to television stations on whose behalf Nexstar is "prohibited from negotiating for retransmission consent on behalf of such station under FCC rules."

Comcast's FCC petition argues that Nexstar effectively "owns" WPIX under the FCC rules and that Nexstar there by violates the ownership cap. In the current motion, Comcast argues that if the FCC finds that Nexstar violates the ownership cap, Nexstar is "prohibited from negotiating for retransmission consent on behalf of" WPIX under the FCC rules within the meaning of the retransmission agreement. Thus, according to Comcast, Nexstar's claim hinges on the FCC's resolution of the question whether Nexstar "owns" WPIX and thereby violates the ownership cap.

1    However, it does not follow from a finding that

2  Nexstar violates the ownership cap, if any such finding is ever

3  made, that Nexstar is thereby "prohibited from negotiating for

4  retransmission consent on behalf of WPIX under FCC's rules."

5  Comcast cites no case, statute, or regulation that so holds.

6  Indeed, Comcast does not dispute that if Nexstar does, in fact,

7  exceed the ownership cap, Nexstar could cure that violation by,

8  for example, divesting stations other than WPIX within two

9  years.  *See* 47 CFR Section 73.3555(e)(3).

10    Nexstar has failed to show that if Nexstar violates

11  the ownership cap, Nexstar is "prohibited from negotiating for

12  retransmission consent on behalf of" WPIX under FCC's rules.

13  Accordingly, the question whether Nexstar "owns" WPIX, in

14  violation of the ownership cap, has no bearing on whether

15  Comcast has violated the retransmission agreement in connection

16  with WPIX, and the Court need not in this case make a finding

17  as to whether Nexstar "owns" WPIX in violation of the ownership

18  cap.

19    The primary jurisdiction doctrine should not be

20  applied to this case.  This is a straightforward contract case.

21  The main issue, as explained by the parties, is whether Comcast

22  violated its contract with Nexstar by failing to pay Nexstar

23  for Nexstar's negotiations on behalf of WPIX.  The answer to

24  that question does not turn on the ownership rules, but rather

25  the negotiations rules, which prohibit the coordination of

1  negotiations between two stations if the stations exist in the

2  same market unless such stations are under common control.  *See*

3  47 CFR 76.65(b)(1)(viii).  While the FCC could make that

4  determination, there is no showing that the application of that

5  rule depends on agency discretion or expertise.  The

6  application of the relevant primary jurisdiction factors argue

7  against dismissing or staying the case while the issue is

8  presented, if ever, to the FCC.

9          As to the first and second factors, the issues in this

10  case fall squarely within the Court's competence and do not

11  implicate the FCC's discretion.  The question whether Nexstar

12  owns WPIX in violation of the ownership cap has no bearing on

13  whether Nexstar is "prohibited from negotiate for the

14  government retransmission consent on behalf of" WPIX under the

15  FCC's rules.  The issues highlighted by Comcast as areas

16  particularly within the FCC's competence or discretion relate

17  to the application of the FCC's rules governing ownership of

18  commercial broadcast stations.  Because those rules have no

19  bearing on the contract dispute in this case, Comcast has

20  identified no question presented in this case that implicates

21  technical or policy considerations within the FCC's particular

22  field of expertise*, see National Communications*, 46 F.3d at

23  223, or the FCC's discretion, *Ellis*, 443 F.3d at 85-86.  To the

24  contrary, the issues actually presented in this case fall

25  readily within the competence of this court.  The case presents

M52HNexO

1    mainly standard contract issues.  *See New York State Thruway*

2    *Authority v. Level 3 Communications, LLC,* 734 F.Supp.2d 257,

3    265 (N.D.N.Y. 2010).  The only issues that go beyond standard

4    contract issues are readily within this court's competence and

5    implicate no FCC discretion.

6         While the breach of contract claim hinges in part on

7    whether Nexstar is "prohibited from negotiation for

8    retransmission consent on behalf of" WPIX under the FCC's

9    rules, the only FCC rule identified by either party that

10   pertains to whether Nexstar "may negotiation for retransmission

11   consent on behalf of" WPIX is 47 CFR Section 76.65(b)(1)(viii).

12   The only issue relevant to the contract dispute in this case

13   that is presented by this rule is whether Nexstar owns a

14   television broadcast station in the same local market as WPIX.

15   That issue is a discrete factual issue that this court is

16   readily capable of answering.

17        The issue, moreover, does not implicate the FCC's

18   discretion given that the relevant rule is clear-cut and was

19   required by Congress.  *See* 47 U.S.C. Section 325(b)(3)(C)(iv)

20   directing the FCC to implement regulations "prohibiting a

21   television broadcast station from coordinating negotiations or

22   negotiating on a joint basis with another television broadcast

23   station in the same local market to grant retransmission

24   consent under this section to" an MVPD.  The first and second

25   factors, therefore, weigh against abstention.

1          Likewise, there is no danger of inconsistent

2    adjudications.  The issue currently before the FCC is whether

3    Nexstar's relationship to WPIX constitutes ownership and

4    therefore violates the ownership cap.  This issue bears no

5    relation to the contract dispute in this case, and the Court

6    will therefore have no reason to resolve it.  Accordingly,

7    there is no risk of inconsistent rulings on this point, and the

8    third factor therefore weighs against abstention.

9          The fourth factor, whether a prior application to the

10   agency has been made, does not support primary jurisdiction in

11   this case.  Comcast has filed a petition with the FCC, but that

12   petition does not implicate directly the negotiation rule, and

13   that petition does not ask the FCC to answer the particular

14   questions that will need to be resolved in this case.

15   Therefore, the relevant factors weigh against application of

16   the primary jurisdiction doctrine.

17         Considerations of judicial economy also weigh against

18   application of the primary -- of the primary jurisdiction

19   doctrine.  Neither party contends that referral of this case to

20   the FCC would result in a quicker resolution.  The Court,

21   therefore, will not dismiss or stay this case based on the

22   primary jurisdiction doctrine.

23         Comcast asks the Court, in the alternative, to stay

24   the case pending the resolution of Comcast's FCC petition

25   pursuant to the Court's inherent authority.  While the Court

M52HNexO

1    has the discretion to do so, a stay is an intrusion into the

2    ordinary processes of administration and judicial review, *Gojo*

3    *Industries, Inc. v. Innovative Biodefense, Inc.*, 407 F.Supp.3d

4    356, 361 (S.D.N.Y. 2019).  Accordingly, the party requesting a

5    stay bears the burden of showing that the circumstances justify

6    an excess of the Court's discretion.  *Id.* at 362.

7         In considering whether to exercise this discretion,

8    courts consider (1) the private interests of the nonmovant in

9    proceeding expeditiously with the civil litigation as balanced

10   against the prejudice to the nonmovant if delayed, (2) the

11   private interests of and burden on the movant, (3) the

12   interests of the courts, (4) the interests of persons not

13   parties to the civil litigation, and (5) the public interest.

14   In this case, Comcast has not made the requisite showing.  For

15   the reasons explained above, the outcome of the FCC proceeding

16   will not affect the outcome of this case.

17        The second factor, the burden on Comcast caused by

18   requiring it to continue litigating this proceeding is

19   negligible because this contract dispute will have to be

20   resolved, and it will not be resolved in the current FCC

21   proceeding.  By the same token, while Comcast argues that

22   Comcast may need to implead or obtain discovery from Mission,

23   because the current FCC proceeding will not resolve the issue

24   in this case, staying the case would only delay the involvement

25   of Mission.

1    The fourth factor also does not weigh in favor of a

2  stay.  The first and third factors weigh against a stay because

3  Nexstar has an interest in obtaining relief if it is entitled

4  to relief, and the Court has an interest in advancing these

5  proceedings.  And Comcast fails to articulate any public

6  interest that would be served by delaying these proceedings

7  which seeks to resolve a private dispute between two

8  sophisticated parties.  Accordingly, the Court will not

9  exercise its discretion to stay the case.

10    The Court has considered all of the arguments of the

11  parties.  To the extent not addressed above, the arguments are

12  either moot or without merit for the forgoing reasons.  The

13  motion to dismiss or to stay this case is denied.

14    The clerk is directed to close docket Nos. 18 and 23.

15    So ordered.

16    OK.  So now it's time for a scheduling order.  I'm

17  just looking over the docket sheet.  Has there been an answer?

18    MS. SESHENS:  Not yet, your Honor.  This is Dana

19  Seshens.

20    THE COURT:  OK.  So 14 days to answer or so?

21    MS. SESHENS:  That would be fine, your Honor.

22    THE COURT:  Why don't we say Comcast will answer by

23  May 20.  The parties should submit a Rule 26(f) report by

24  June 3.

25    How long do the parties think for discovery in this

1   case?  I know you're going to have a --

2            MR. KAMIN:  I apologize.

3            THE COURT:  Thank you.  No, no, it's OK.  It's a

4   difficulty of holding a conference by telephone.  You're both

5   very polite, and I appreciate it, and no one was trying to cut

6   me off.

7            So any estimates with respect to time for discovery?

8   I was going to say I appreciate that the answer to that

9   question may turn on your conference under Rule 26, but go

10  ahead.

11           MR. KAMIN:  Thank you, your Honor.  Mitch Kamin, for

12  Nexstar.

13           I do think it will in part turn on the conference, but

14  we believe an expedited discovery schedule makes sense given

15  the narrow scope of the contract issue in this case and the

16  limited amount of discovery that should be necessary here.

17           MS. SESHENS:  Your Honor, this is Dana Seshens again.

18           I agree with Mr. Kamin that at least in part the

19  duration will depend on the conference, and we're happy to

20  confer about this as part of the Rule 26(f) process.  But

21  there, obviously, will be, from our perspective, very likely

22  implications for Mission and additional potential claims here

23  that are related.  So that may complicate the schedule just a

24  bit.  And if Mr. Kamin has no objection, I think we can confer

25  about the duration and come to a reasonable schedule, but happy

1    to take guidance from the Court on that as we sit here now.

2            THE COURT:  No, that's great.  I mean, I encourage the

3    parties to arrive at a reasonable schedule if, in fact, there

4    is a third-party complaint against Mission.  Is that what

5    Comcast is contemplating?

6            MS. SESHENS:  Yes, your Honor.

7            THE COURT:  You don't have to commit yourself.  Well,

8    if that's true, I have to give time for Mission to respond to

9    the third-party complaint, and Mission should be part of the

10   Rule 26(f) conference.  So if there is a third-party complaint

11   against Mission, the parties should send me a letter and delay

12   the transmission -- delay the filing of the 26(f) report for a

13   short time to allow Mission to participate in the Rule 26

14   conference and submit a joint 26(f) report.

15           How much time is necessary for discovery in this case?

16   I wouldn't think that you'd need more than 90 days for

17   discovery, but I'm certainly not on top of what the scope of

18   the discovery would be in the case.

19           MS. SESHENS:  Your Honor, one point I might add, just

20   in the interest of transparency as we're talking about the

21   potential landscape for this case, is there also could be a

22   counterclaim against Nexstar to which it will have to answer

23   or, if it so chooses, move.  It would obviously be up to

24   Nexstar to decide, but just as we think about the full range or

25   full scope of what the case could look like, that is on the

1   table as well.  And so didn't want that to come as a surprise

2   to your Honor if the schedule winds up needing to incorporate

3   some time for that as well.

4           THE COURT:  No, no, that's fine.  Sure, no problem.

5           OK.  Anything else that we could do today?

6           MR. KAMIN:  Nothing further from the plaintiff, your

7   Honor.  Thank you.

8           MS. SESHENS:  And nothing further from the defendant

9   either.  Thank you for your time, your Honor.

10          THE COURT:  OK.  Thank you all.  Great.  Bye now.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25